**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

BÜNYAMIN ATEŞ, el al.    :
            :
    **Plaintiffs,**  :  **3:15-CV-2354**
 **v.**         :  **(JUDGE MARIANI)**
            :
**MUHAMMED FETHULLAH GÜLEN,** :
**et al.**         :
            :
    **Defendants.**  :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Defendant Muhammed Fethullah Gülen's Motion to Dismiss the Complaint (Doc. 33) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) as well as on First Amendment grounds.

On December 7, 2015, Plaintiffs Bünyamin Ateş, Turgut Yildirim, and Murat Oztürk filed a Complaint in the above-captioned matter naming as defendants Muhammed Fethullah Gülen and Does 1-50 (Doc. 1). Plaintiffs' Complaint sets forth six counts: Persecution of Members of the Doğan Movement (Count I), Aiding and Abetting Persecution of Members of the Doğan Movement (Count II), Arbitrary Arrest and Prolonged Detention of Plaintiffs (Count III), and Aiding and Abetting Arbitrary Arrest and Prolonged Detention of Plaintiffs (Count IV), all pursuant to the Alien Tort Statute ("ATS"), as well as False Imprisonment (Count V) and Civil Conspiracy (Count VI) pursuant to Pennsylvania state law.

Defendant Gülen moved to dismiss the Complaint on February 3, 2016 (Doc. 33), to

which Plaintiffs filed a brief in opposition (Doc. 36) and Defendant filed a reply brief (Doc.

44). On April 1, 2016, Defendant filed a Motion for Rule 11 Sanctions Against Plaintiffs and

their Counsel (Doc. 45), which will be addressed in a separate Order.

Upon request of the Court, oral argument on Defendant's motions was held on May

25, 2016.

The issues have been fully briefed and argued and the parties have submitted

extensive documentary evidence in support of their respective positions. For the reasons

set forth below, the Court will grant Defendant Gülen's Motion to Dismiss.

## II. FACTUAL ALLEGATIONS

Plaintiffs' Complaint alleges the following facts:

The three plaintiffs, Bünyamin Ateş, Turgut Yildirim, and Murat Oztürk, are Turkish

citizens and permanent residents of Turkey. The plaintiffs are "devout Muslims, connected

through their affiliation with an independent offshoot of the Nur Movement known as the

'Doğan Movement,' which follows the interpretations of Mehmet Doğan on the teachings of

Said Nursi." (Doc. 1, ¶ 11).

Defendant Gülen is a Muslim cleric of Turkish origin who promotes an Anatolian

version of Islam. (*Id.* at ¶ 3). The movement that follows Gülen's religious instruction "is

ostensibly an offshoot of the Nur Movement, but its deviation from Said Nursi's teachings

2

has raised criticism from other branches of the Nur Movement, and most vociferously from the branch with which Plaintiffs are affiliated." (*Id.*).

Gülen has been a lawful permanent resident in the United States since 1998 but remains active in Turkey while living in Pennsylvania through his acolytes in the Gülen Movement as well as his weekly online broadcasts in Turkish. (*Id.* at ¶ 4). Defendant has an international following of approximately 10 million people and has developed a network of businesses and non-governmental organizations that provide him financial support and it is estimated that Gülen controls at least $25 billion in assets. (*Id.* at ¶ 9). In the United States, Gülen controls dozens of business entities and over 120 charter schools in several states. (*Id.*). All of Defendant Gülen's actions described in the Complaint occurred in Pennsylvania. (*Id.*).

Defendants Does 1-50 "are all co-conspirators with the Defendant [Gülen] and were in some form or matter directly or indirectly involved in carrying out the conspiracy and other acts alleged" in the Complaint. (Doc. 1, ¶ 10).

Plaintiffs allege that Defendant Gülen "issued orders from within this jurisdiction directing his well-placed religious followers residing in Turkey to launch a targeted campaign of persecution against a different religious group in Turkey that resulted in the arbitrary and prolonged detention of Plaintiffs, along with dozens of fellow members of their religious group. Defendant took these actions because of critical statements made by members of Plaintiffs' religious group and the fact that Defendant had access to a network of loyal state

officials – police, prosecutors, and judges – in Turkey willing to do his bidding." (*Id.* at ¶ 1). Specifically, on Gülen's orders, his co-conspirators in Turkey planted evidence, fabricated search warrants, secured illegal wiretaps, and ultimately arrested Plaintiffs without any legal basis, unlawfully detaining them for periods of up to 20 months. (*Id.* at ¶ 2).

Over the last twenty years, Gülen has "implemented a political strategy of encouraging his followers to secure official positions within the official Turkish state apparatus – notably in police, prosecutorial and judicial positions – through whom he is able to exercise a corrupt influence in Turkish society." (*Id.* at ¶ 5). Gülen and his "network" were allegedly responsible for "several recent high-profile show trials" and "the massive, corrupt attack by Gülen Movement loyalists within Turkish law enforcement and the judiciary against members of [Gülen's] political opposition within the lawfully constituted government of Turkey." (*Id.* at ¶¶ 6, 7). Gülen has since been formally charged in Turkey with infiltrating key state institutions in order to overthrow the government. (*Id.* at ¶ 8).

According to Plaintiffs, Mehmet Doğan and members of the Doğan Movement have openly criticized Gülen for "defiling the Nur Movement and deviating from the teachings of Said Nursi." (Doc. 1, ¶ 15). Doğan has written several works expressing his disagreement with Gülen's theology, which were disseminated through Turkish publishing houses named *Tahşiye* and Rahle, both of which are partially owned by Plaintiff Ateş. (*Id.*).

On or about April 6, 2009, Gülen "in effect issued instructions to his followers illegally to misuse the Turkish law enforcement system against the members of the Doğan

4

Movement, which included Plaintiffs." (*Id*. at ¶ 16). Gülen published a video speech on a website he controlled, in which he "used the term *Tahşiye* to refer to members of the Doğan Movement, likened *Tahşiye* to the terrorist organization al-Qaeda, and predicted that *Tahşiye* would be given military weaponry and would engage in violent activity against innocent civilians in Turkey." (*Id*. at ¶ 17).

On or about April 9, 2009, Gülen continued to issue "instructions" through an episode of the television series *Tek Türkiye*, which is broadcast nationally throughout Turkey on a network "openly supportive of and indirectly controlled by Mr. Gülen." (Doc. 1, ¶ 18). During that episode, "the narrator discussed in ominous tones a 'dark council' consisting of the international powers dealing with the affairs of certain nations, including Turkey, and identified a group named *Tahşiye*, affiliated with al-Qaeda, as the new terror organization to create a state of chaos in Turkey." (*Id*.). Two weeks later, the narrator made similar predictions about a group he identified as "Rahle" in another episode of *Tek Türkiye*. Gülen "was aware of and secretly approved the content of both television programs before they aired." (*Id*.).

Plaintiffs allege that Gülen's speech and the subsequent television programs were intended to direct members of the Gülen Movement inside the Turkish criminal justice system to take action against Plaintiffs and other members of the Doğan Movement, and Gülen's followers in fact acted in direct response thereto. (*Id*. at ¶ 19).

5

On or about April 24, 2009, Ali Fuat Yilmazer, Chief of the Intelligence Division of the Istanbul Police Department and a Gülen loyalist, issued an intelligence note to the General Directorate of Police in Ankara identifying *Tahşiye* as a potentially dangerous organization. (Doc. 1, ¶ 21). On or about May 14, 2009, based in part upon Chief Yilmazer's note, police chiefs loyal to Gülen in 15 Turkish provinces, with the consent of prosecutors in those provinces, applied to judges loyal to Gülen for judicial consent to wiretap telephones belonging to members of the Doğan Movement, and for consent to surveil those members. (*Id.* at ¶ 22).

Pursuant to the judicial orders, over the following nine-month period police officers surveilled members of the Doğan Movement, including Plaintiffs. From an initial target of 10 people, the wiretaps were extended 16 times to surveil 56 members of the Doğan Movement. (*Id.* at ¶ 23).

On or about January 20, 2010, police officers "illegally" entered residential premises used by members of the Doğan Movement for religious gatherings and owned by the deceased brother of Plaintiff Yıldırım. (*Id.* at ¶ 24). During this entry, police officers planted inert explosive devices inside the premises "in order to fraudulently incriminate the members of the Doğan Movement." (*Id.*).

The following day, police officers effected a fraudulent search warrant for the same premises, during which they claimed to discover the explosive devices they had previously planted, which devices they attributed to members of the Doğan Movement. (*Id.* at ¶ 25).

As a consequence of the purported discovery of allegedly incriminating evidence, approximately 40 members of the Doğan Movement, including Plaintiffs, were arrested and charged with participation in terrorist activities. (Doc. 1, ¶ 26). Yıldırım was charged with membership of an armed terror organization as well as multiple charges of possession of illegal weapons and Ateş and Öztürk were charged with membership of an armed terror organization. (Id.).

"As a consequence of Mr. Gülen's instructions and the conspiracy that followed, Plaintiffs were wrongfully incarcerated in Turkey for periods ranging between 8 months and 20 months." (Id. at ¶ 27).

Plaintiffs became aware of their claims on or about December 2014, when the Turkish government "discovered the conspiracy, launched an investigation and removed the conspirators from their official positions." (Id. at ¶ 28). Since this time, Plaintiffs have been released from incarceration, and replacement prosecutors have recommended dismissal of the criminal charges against them. In September 2015, an indictment was issued against the co-conspirators in Turkey, and the following month the case was accepted by the Turkish courts. (Id.).

Despite each of Plaintiffs' allegations, "Gülen has at all times actively concealed, and he continues to conceal, the true nature of his involvement in the actions that led to the unlawful persecution and detention of Plaintiffs, preventing Plaintiffs from having the ability

to know that he was the driving force behind their persecution, arrest and prolonged

detention." (Doc. 1, ¶ 29).

## III. STANDARD OF REVIEW

### A. Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

"Federal courts are courts of limited jurisdiction. They possess only that power

authorized by Constitution and statute, which is not to be expanded by judicial decree."

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d

391 (1994) (internal citations omitted).

> [T]he federal courts are without power to adjudicate the substantive claims in
> a lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal
> authority is, in a particular instance, open to question, it is incumbent upon the
> courts to resolve such doubts, one way or the other, before proceeding to a
> disposition of the merits.

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977).

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is

power to declare the law, and when it ceases to exist, the only function remaining to the

court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S.

(7 Wall.) 506, 514, 19 L.Ed. 264 (1868). This rule "'springs from the nature and limits of the

judicial power of the United States' and 'is inflexible and without exception.'" *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)

(quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L. Ed.

462 (1884)).

8

A Motion to Dismiss for lack of subject-matter jurisdiction is properly made under

Federal Rule of Civil Procedure 12(b)(1). "A district court has to first determine, however,

whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at

issue, because that distinction determines how the pleading must be reviewed."

*Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 357 (3d Cir. 2014).

> A facial attack, as the adjective indicates, is an argument that considers a
> claim on its face and asserts that it is insufficient to invoke the subject matter
> jurisdiction of the court because, for example, it does not present a question
> of federal law, or because there is no indication of a diversity of citizenship
> among the parties, or because some other jurisdictional defect is present.
> Such an attack can occur before the moving party has filed an answer or
> otherwise contested the factual allegations of the complaint. A factual attack,
> on the other hand, is an argument that there is no subject matter jurisdiction
> because the facts of the case – and here the District Court may look beyond
> the pleadings to ascertain the facts – do not support the asserted jurisdiction.

*Id.* at 358.

In considering a factual attack on subject-matter jurisdiction, "the court may consider

evidence outside the pleadings." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d

Cir. 2000). Moreover, "the burden of establishing the [existence of subject-matter

jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal

citations omitted). This is because, since the federal courts' jurisdiction is strictly limited by

Constitution and statute, "[i]t is to be presumed that a cause lies outside this limited

jurisdiction." *Id.*

## B. Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not

entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendant Gülen relies on four arguments in support of his motion to dismiss, specifically that this Court lacks subject matter jurisdiction over Plaintiffs' ATS claims, that the Act of State Doctrine bars Plaintiffs' claims, that Plaintiffs failed to meet the factual pleading standard set forth in *Iqbal* and *Twombly*, and that Gülen's sermon is protected speech under the First Amendment. (*See* Doc. 33-1). Because this Court concludes that

11

Plaintiffs' Complaint does not plead facts sufficient to confer subject matter jurisdiction over Plaintiffs' ATS claims and that their claims are further barred by the Act of State Doctrine, we decline to address Defendant's First Amendment argument.

## A. The Alien Tort Statute

The first four Counts of Plaintiffs' Complaint are brought pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

The ATS is "strictly jurisdictional . . . in the sense of addressing the power of the [federal] courts to entertain cases concerned with a certain subject." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 713-714, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Specifically, the ATS "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Kiobel v. Royal Dutch Petroleum Co.,* --- U.S. ---, 133 S.Ct. 1659, 1664, 185 L.Ed.2d 671 (2013).

The scope of the ATS is historically very narrow. When Congress passed the ATS, only "three principal offenses against the law of nations had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 1666 (internal quotation marks omitted). The first two offenses provide "no support for the proposition that Congress expected causes of action to be brought under the statute for violations of the law of nations occurring abroad." *Id.* at 1667. With respect to piracy,

"[a]pplying U.S. law to pirates . . . does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign, and therefore carries less direct foreign policy consequences." *Id.* As a result, the existence of a cause of action against pirates does not provide a sufficient basis for concluding that the ATS reaches conduct which occurs in the territory of another sovereign. *Id.* In light of this limited scope of the ATS, the Supreme Court has cautioned that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted." *Sosa,* 542 U.S. at 732.

In *Kiobel,* Nigerian nationals residing in the United States sued Dutch, British, and Nigerian corporations pursuant to the ATS, claiming that those corporations aided and abetted the Nigerian government in committing beatings, rapes, and murders of persons who protested the environmental effects of these corporations' joint subsidiary – Shell Petroleum Development Company of Nigeria – as well as providing the Nigerian forces with food, transportation, and compensation. 133 S.Ct. at 1662-1663. In affirming the Second Circuit's dismissal of Plaintiffs' complaint, the Supreme Court held that the presumption against extraterritoriality applies to claims under the ATS, thus constraining courts exercising their power under that statute. *Id.* at 1665, 1669. In other words, "[t]he presumption against extraterritoriality guards against our courts triggering . . . serious foreign policy consequences [such as other nations, also applying the law of nations, being

able to hale United States' citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world], and instead defers such decisions, quite appropriately, to the political branches." *Id.* at 1669. The presumption thus serves "to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* at 1664 (citation omitted).

Although in *Kiobel* "all the relevant conduct took place outside the United States," the Supreme Court made clear that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 1669. However, the Court "[left] for another day the determination of just when the presumption against extraterritoriality might be 'overcome'". *Id.* at 1673 (Breyer, J., concurring); *see also id.* at 1669 (Kennedy, J., concurring) (stating that the majority opinion of the Court "leave[s] open a number of significant questions regarding the reach and interpretation of the [ATS]"); *id.* at 1669-1670 (Alito, J., concurring) (noting that the "narrow approach" of the majority "obviously leaves much unanswered").[1]

---

[1] While not binding, Justice Breyer's concurrence in the *Kiobel* judgment, joined in by Justices Ginsburg, Sotomayor, and Kagan, arguably provided Courts with additional guidance by enumerating three factors to be taken into consideration when determining whether the presumption against extraterritoriality can be overcome:

> I believe that the statute provides jurisdiction where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind.
> I would interpret the statute as providing jurisdiction only where distinct American interests are at issue.

The Supreme Court's language made clear that even when, unlike in *Kiobel*, some relevant conduct does occur within the United States territory, it may not be sufficient to overcome the presumption against extraterritoriality. However, the Court's decision to not define the contours of the operative "touch and concern" language has led to differing analyses on its application, with most Circuit Courts finding the "focus" test set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) to be particularly instructive.[2] *Compare Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014), *and Baloco v. Drummond Co., Inc.*, 767 F.3d 1229 (11th Cir. 2014) *with Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014); *see also Kiobel*, 133 S.Ct. at 1670 (Alito, J., concurring) (applying the *Morrison* "focus" test to the ATS).

Although the ATS' scope and applicability has not been widely analyzed by courts since *Kiobel* and the parties do not point to any case factually similar to the present action, nor could the Court find any, several cases interpreting and applying *Kiobel* offer useful guidance to this Court's analysis.

To date, the only instruction provided by the Third Circuit with respect to the applicability of the ATS since *Kiobel* is *Ben-Haim v. Neeman*, 543 F.App'x 152 (3d Cir.

---

*Kiobel*, 133 S.Ct. at 1674. If this Court were bound by the heightened standard set forth by Justice Breyer, Plaintiffs' ATS action must fail, in large part because Plaintiffs do not identify, nor can the Court find, the necessary "important" or "distinct" American interest.

[2] In *Morrison*, the Supreme Court applied the presumption against extraterritoriality to Security Exchange Act cases and found that Courts must determine the "focus" of the statute at issue i.e. to rebut the presumption, "the 'focus' of congressional concern" or the conduct "that the statute seeks to 'regulate'" must occur in the territory of the United States. *Morrison*, 561 U.S. at 266-267.

2013). *Ben-Haim* involved three fathers who were dissatisfied with the resolution of their

marital and child custody cases in Israeli courts and brought suit against various Israeli

officials and three charitable entities claiming that Israel's family law system discriminated

unfairly against fathers in child custody and support disputes. Acknowledging that subject

matter jurisdiction under the ATS is "very limited", the Third Circuit affirmed the District

Court's dismissal of the Complaint and relying on *Kiobel* found that all of the conduct which

formed the basis for Plaintiffs' ATS claims took place in Israel and thus subject matter

jurisdiction was lacking in U.S. federal courts. *Id.* at 154-155.

As a result of the limited applicability of *Ben-Haim* to the case presently before the

Court, we look to other cases both within and outside the Third Circuit.

The Fourth Circuit's examination of the applicability of the ATS provides persuasive

insight into how this Court should identify the confines of the ATS in determining whether

Plaintiffs in the present case can displace the presumption against extraterritoriality with

sufficient force to confer subject matter jurisdiction on this Court. Although factually

dissimilar, as one of the only cases wherein a Court has found the presumption to be

displaced, *Al Shimari v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014)

provides this Court with a factual basis from which we can compare the alleged facts of the

present case with those of a case where the allegations were found to be sufficient to

displace the presumption.

In *Al Shimari*, the four plaintiffs were foreign nationals and the defendant, CACI

Premier Technology, was a corporation domiciled in the United States who provided the

United States with civilian contractors to interrogate detainees at Abu Ghraib. 758 F.3d at

521. The plaintiffs alleged that they were tortured and otherwise mistreated by the

American civilian and military personnel while detained at Abu Ghraib. Plaintiffs further

alleged that CACI employees "instigated, directed, participated in, encouraged, and aided

and abetted conduct towards detainees that clearly violated the Geneva Conventions, the

Army Field Manual, and the laws of the United States." In particular, the plaintiffs alleged

that CACI interrogators operated with "little to no supervision" and that military personnel

carried out certain orders issued by the CACI civilian interrogators. *Id*. at 521-522.

In determining that the District Court erred in dismissing Plaintiffs' action pursuant to

the ATS, the Circuit found that unlike *Kiobel*, where the mere presence of a corporation in

the United States was insufficient, in this case the plaintiffs' claims invoked substantial ties

to the U.S. which involved the performance of a contract executed by a U.S. corporation

with the U.S. government, and acts of torture undertaken by U.S. citizens at a military facility

operated by U.S. government personnel, thereby reflecting "extensive 'relevant conduct' in

United States territory." *Id*. at 528. As a result, "it is not sufficient merely to say that

because the actual injuries were inflicted abroad, the *claims* do not touch and concern

United States territory." *Id*. (emphasis in original). Thus, when applying the "touch and

concern" language, a Court should consider a "broader range of facts than the location

where the plaintiffs actually sustained their injuries." *Id.* at 529.

Following a fact-based analysis, the Fourth Circuit concluded that Plaintiffs' ATS

claims "touched and concerned" the territory of the United States with sufficient force to

displace the presumption against extraterritoriality based on the following alleged facts:

> (1) CACI's status as a United States corporation; (2) the United States
> citizenship of CACI's employees, upon whose conduct the ATS claims are
> based; (3) the facts in the record showing that CACI's contract to perform
> interrogation services in Iraq was issued in the United States by the United
> States Department of the Interior, and that the contract required CACI's
> employees to obtain security clearances from the United States Department
> of Defense; (4) the allegations that CACI's managers in the United States
> gave tacit approval to the acts of torture committed by CACI employees at the
> Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if
> not expressly, encouraged" it; and (5) the expressed intent of Congress,
> through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens
> access to United States courts and to hold citizens of the United States
> accountable for acts of torture committed abroad.

*Id.* at 530-531.

In contrast, in *Balintulo v. Ford Motor Company*, the Second Circuit found there were

insufficient allegations of conduct touching and concerning the United States to displace the

presumption against extraterritoriality. In that case, victims of the South Africa apartheid

brought suit against several American corporations pursuant to the ATS for the companies'

U.S. based actions allegedly constituting unlawful aiding and abetting of crimes by the

companies' subsidiaries in violation of the law of nations. 796 F.3d 160, 163-165 (2d Cir.

2015), *cert. denied*, --- S.Ct. ---, 2016 WL 561746 (Mem), 84 USLW 3454 (2016).

Specifically, plaintiffs allege that defendant Ford (1) provided specialized vehicles to the South African police and security forces to enable these forces to enforce apartheid, and (2) shared information with the South African regime about anti-apartheid and union activists, thereby facilitating the suppression of anti-apartheid activity. As for IBM, plaintiffs claim that the company (1) designed specific technologies that were essential for racial separation under apartheid and the denationalization of black South Africans; (2) bid on, and executed, contracts in South Africa with unlawful purposes such as "denationalization" of black South Africans; and (3) provided training, support, and expertise to the South African government in using IBM's specialized technologies.

*Id*. at 165.

The Circuit Court affirmed the District Court's ruling that even after the plaintiff's

complaint was amended, it did not allege "sufficient conduct to displace the ATS's

presumption against extraterritoriality." *Id*. at 166. The Court stated that to determine

whether specific claims can be brought under the ATS, the Court must isolate the "relevant

conduct" of a defendant and then conduct a two-step jurisdictional analysis. *Id*.

Step one is a determination of whether that 'relevant conduct' sufficiently 'touches and concerns' the United States so as to displace the presumption against extraterritoriality. Step two is a determination of whether that *same* conduct states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations.

*Id*. at 167. The Court in *Balintulo* explained:

In order to satisfy the second step of this analysis, a plaintiff stating a claim under an aiding and abetting theory must demonstrate that the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime. The *mens rea* standard for accessorial liability in ATS actions is purpose rather than knowledge alone. Knowledge of or complicity in the perpetration of a crime – without evidence that the defendant

purposefully facilitated the commission of that crime – is thus insufficient to establish a claim of aiding and abetting liability under the ATS.

*Id.*

In analyzing Plaintiffs' claims under these steps, the Court found that despite Plaintiffs' allegations, the amended pleadings did not "plausibly allege that the Companies themselves engaged in any 'relevant conduct' within the United States to overcome the presumption against extraterritorial application of the ATS." *Balintulo*, 796 F.3d at 168. The Court noted that it was Ford's subsidiaries in South Africa that were actually accused of having engaged in the alleged actions and it rejected an attempt to impose liability on Ford based on its control of its South African subsidiary on a vicarious liability theory. In relevant part, just as with Ford, with respect to co-defendant IBM the Court found that it was its South African subsidiary, not IBM itself, that allegedly trained the South African government employees. Although the Court found that the allegations against IBM that it developed and created "identity" software and hardware in the United States and transferred this system to the Bophuthatswana government was both relevant conduct and touched and concerned the United States, Plaintiffs' claim did not meet the *mens rea* requirement for aiding and abetting liability and thus failed. *Id.* at 168-170.

The Eleventh Circuit examined a similar issue as *Balintulo* in *Doe v. Drummond Company, Inc.*, 782 F.3d 576 (11th Cir. 2015). In that case, the legal heirs of Colombian citizens who were murdered by a Colombian paramilitary group brought suit against numerous defendants, including a multinational coal mining corporation based in the United

States, its subsidiary, and several of its high-ranking corporate officers, seeking relief under the ATS and the Torture Victims Protection Act on claims that the company had aided and abetted and conspired with the paramilitary group in its extrajudicial killings, crimes against humanity, and war crimes. *Drummond*, 782 F.3d at 579-580. The District Court entered summary judgment for the Defendants. On appeal, the Eleventh Circuit affirmed, holding in relevant part that Plaintiffs' claims did not permit jurisdiction under the ATS. The Court of Appeals found that Plaintiffs' claims did not "touch and concern" the territory of the United States, "or rather that they do not do so with sufficient force to displace the presumption and permit jurisdiction." *Id.* at 583. Following an analysis of the jurisdictional inquiries taken by its own Circuit, as well as the Second, Fourth, and Ninth Circuits[3], the Court determined that the "jurisdictional inquiry requires [a Court] to consider the domestic or extraterritorial location where the defendant is alleged to engage in conduct that directly or secondarily results in violations of international law within the meaning of the ATS. . . . When the claim is for secondary responsibility, [a Court] must also consider the location of any underlying conduct, such as where the actual injuries were inflicted." *Id.* at 592-593 (internal citations omitted). A Court must also consider whether the plaintiffs' claims are focused within the

---

[3] The Eleventh Circuit focused its analysis on the following Circuit cases which had interpreted and applied the "undefined 'touch and concern' test from *Kiobel*" and had addressed the effect of the presumption with regard to an ATS claim involving a U.S. citizen defendant or where events underlying the claim occurred both domestically and extraterritorially: *Al Shimari v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014); *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014); *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014); *Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir 2014); *Cardona v. Chiquita Brands Intern., Inc.*, 760 F.3d 1185 (11th Cir. 2014); *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229 (11th Cir. 2014). *Drummond*, 782 F.3d at 586-592.

United States and, if so, to what extent – "that is, whether the plaintiffs have proffered allegations and evidence to the 'degree necessary' to warrant displacing the presumption." *Id.* at 593.

While the Court found that factors such as U.S. citizenship and the importance of the U.S. interests invoked by the nature of Defendants' conduct are relevant in determining whether claims "touch and concern" the United States, the key inquiry is whether the relevant conduct which occurred in the United States does so with "sufficient force" or to the "necessary degree" to displace the presumption against extraterritoriality. The Circuit found that "enough" of the relevant conduct must have occurred domestically, and in looking at what contacts with, or connections to, the U.S. are relevant, an "inquiry may indeed extend to the place of decision-making." *Id.* at 597. The Court further noted that "when considering claims that the defendants aided and abetted or conspired with the perpetrators who committed the underlying violation, the domestic or extraterritorial location of all conduct in support of those claims is relevant to the jurisdictional inquiry." *Id.* at 597-598.

In applying these standards and following a "fact-intensive inquiry", the Eleventh Circuit found that:

> Plaintiffs' claims do not allege sufficient domestic conduct to displace the presumption. Plaintiffs allege that generally, Defendants made funding and policy decisions in the United States; but Plaintiffs specifically allege that the agreements between Defendants and the perpetrators of the killings, the planning and execution of the extrajudicial killings and war crimes, the collaboration by Defendants' employees with the AUC, and the actual funding of the AUC all took place in Colombia. In light of our precedent, the domestic

> location of the decision-making alleged in general terms here does not
> outweigh the extraterritorial location of the rest of Plaintiffs' claims.

*Drummond*, 782 F.3d at 598.  Additionally, the Court stated that Plaintiffs' allegations of

domestic conduct and connections were not "extensive or specific" enough to meet the

necessary requirements to warrant displacement.  *Id*. at 598-600.

Aside from above-discussed opinions by the Fourth, Second, and Eleventh Circuits,

two District Court actions also offer useful guidance in that they provide examples of the

factual allegations necessary to rebut the presumption against extraterritoriality and thus

provide a U.S. federal court with subject matter jurisdiction.

In *Krishanti v. Rajaratnam*, 2014 WL 1669873 (D.N.J. 2014), the District Court

rejected the Rajaratnam Defendants' argument that the Court lacked subject matter

jurisdiction over Plaintiffs' aiding and abetting crimes against humanity claim pursuant to the

ATS.  There, the Rajaratnam Defendants, a father and son who were both United States

citizens, were sued for supporting the efforts of the Liberation Tigers of Tamil Elam

("LTTE"), an organization designated as a terrorist organization by the United States.

Unlike *Kiobel*, *Balintulo*, and *Ben-Haim*, where all of the alleged relevant conduct took place

in foreign territories, Plaintiffs did not allege any actions by the Rajaratnam Defendants

outside of the United States. *Krishanti*, 2014 WL 1669873, at *10.  The Court found that it

had subject matter jurisdiction based on Plaintiffs' allegations that:

> i) Jesuthasan Rajaratnam hosted meeting[s] with LTTE operatives and
> speakers for LTTE fundraisers at his home in New Jersey; ii) Rajakumara
> Rajaratnam personally gave $1,000,000 to TRO-USA, and this money was

subsequently funneled to the TRO in Sri Lanka; iii) the Rajaratnam Defendants created corporations in order to contribute money to organizations supporting the LTTE; and iv) LTTE operatives identified Jesuthasan Rajaratnam as a source for money used to bribe United States officials in connection with LTTE's attempts to remove itself from the United States' list of FTOs.

*Id.*

The District Court of Massachusetts also held that a plaintiff's allegations were

sufficient to establish jurisdiction under the ATS in *Sexual Minorities Uganda v. Lively*, 960

F.Supp.2d 304 (D.Mass. 2013). In *Lively*, an umbrella organization in Uganda whose

member organizations advocated for the fair and equal treatment of lesbian, gay, bisexual,

transgender, and intersex people in Uganda brought an action under the ATS alleging that

the defendant, an American citizen residing in the United States, acting in concert with

others through actions taken within the U.S. and Uganda, violated international customary

law and plotted and conspired to persecute the LGBTI community in Uganda. 960

F.Supp.2d at 309-310.

The Court found that the tortious conduct alleged by Plaintiff "took place to a

substantial degree within the United States, over many years, with only infrequent actual

visits to Uganda." *Id.* at 321. Specifically, a review of Plaintiff's allegations revealed that:

the Amended Complaint alleges that Defendant resides and operates out of Springfield, Massachusetts. It describes how, after Defendant traveled to Uganda in 2002, he continued to assist, manage, and advise associates in Uganda on methods to deprive the Ugandan LGBTI community of its basic rights. Defendant's Ugandan co-conspirators then contacted him in the United States in 2009 to craft tactics to counter the Ugandan High Court ruling confirming that LGBTI persons enjoyed basic protections of the law. After

24

> going to Uganda in 2009, Defendant continued to communicate from the United States through Martin Ssempa to members of the Ugandan Parliament about the legislation proposing the death penalty for homosexuality. From his home in the United States, he reviewed a draft of the legislation and provided advice on its content.

*Id*. at 323 (internal citations omitted). The Court noted that "[t]he fact that the impact of Defendant's conduct was felt in Uganda cannot deprive Plaintiff of a claim. Defendant's alleged actions in planning and managing a campaign of repression in Uganda from the United States are analogous to a terrorist designing and manufacturing a bomb in this country, and which he then mails to Uganda with the intent that it explode there." *Id*. at 321-322.

Turning now to the present action, a review of Supreme Court, Circuit Court, and District Court opinions demonstrate that in evaluating whether a plaintiff's complaint alleges sufficient facts to overcome the presumption against extraterritoriality, a Court must determine: (1) the relevant conduct in the matter; (2) whether that conduct touches and concerns the United States; (3) whether the relevant conduct is sufficiently forceful to displace the presumption against extraterritoriality; and (4) whether that relevant conduct states a claim for a violation of the law of nations or aiding and abetting another person or group's violation of the law of nations. A defect in any of these jurisdictional predicates is fatal to a plaintiff's claims and courts retain discretion in determining the order and manner in which they undertake an ATS jurisdictional inquiry. *See Balintulo*, 796 F.3d at 165-166.

With respect to "relevant conduct", although the Supreme Court used this operative term to frame its "touch and concern" test in *Kiobel*, it provided no actual definition.

Nonetheless, Circuit Courts addressing this issue seemingly agree that the "relevant conduct" for purposes of invoking the ATS is "conduct that is alleged to be either a direct violation of the law of nations or the aiding and abetting of another's violation of the law of nations." *Balintulo,* 796 F.3d at 166; *see also Baloco v. Drummond Co., Inc.,* 767 F.3d 1229, 1236 (11th Cir. 2014)(Assuming, without deciding, that although the "relevant conduct" inquiry extends to the place of decision-making – as opposed to the site of the actual "extrajudicial killing" – the allegations in the complaint did not suggest conduct in the United States directed at the murders of the union leaders, or that was indicative of an express quid pro quo understanding that the Defendant would finance paramilitary AUC operations in exchange for the AUC carrying out killings.).

Plaintiffs' Complaint appears to assert both forms of conduct – possibly in the alternative – as Counts I and III are titled as if to allege a direct violation of international customary norms, whereas Counts II and IV allege that Defendants aided and abetted the commission of these violations. (*See generally* Doc. 1; Of. Tr., May 25, 2016 Oral Arg. (hereinafter "Oral Arg."), Doc. 54, at 56-57 (wherein Plaintiffs' counsel stated that "[i]f the Court or jury were to find that [Gülen] was not the principal, they could find that he aided and abetted the conduct" and that if Gülen "was found liable as a principal, the aiding and abetting would be kind of irrelevant.")).

Regardless, the alleged relevant conduct remains the same. Namely, Plaintiffs' action revolves around their key allegation that, in April of 2009, Gülen "in effect issued

instructions to his followers illegally to misuse the Turkish law enforcement system against

the members of the Doğan Movement, which included Plaintiffs", by publishing a video

speech on a website he controlled, in which Gülen "used the term *Tahşiye* to refer to

members of the Doğan Movement, likened *Tahşiye* to the terrorist organization al-Qaeda,

and predicted that *Tahşiye* would be given military weaponry and would engage in violent

activity against innocent civilians in Turkey." (Doc. 1, ¶¶ 16, 17).

Preliminarily, Defendant Gülen's speech does not, on its face, contain instructions to

his followers in Turkey to take any specific action(s) against members of the Doğan

Movement. (*See generally,* "Mr. Gülen Speech 2009_04_06", Doc. 33, Ex. D). Both parties

agree that this Court is not required to look at the speech in question but that it is within the

Court's purview to do so when performing a Fed. R. Civ. P. 12(b)(1) analysis based on a

factual attack. (Oral Arg., at 18-19, 41-43). A review of the speech reveals the absence of

any direct instruction by Defendant Gülen, a fact Plaintiffs' counsel does not dispute. At

Oral Argument, Plaintiffs' counsel admitted that any instructions were not direct, but rather

communicated through a "dog-whistle" theory. (Oral Arg., at 40-41, 44, 50).[4] This argument

was not alleged in the Complaint, nor raised in Plaintiffs' brief in opposition to Defendant's

motion to dismiss and therefore need not be addressed here. However, even assuming that

---

[4] At Oral Argument, the Court inquired whether there was "something in [Gülen's] speech, some passage or passages, which [] literally or by reasonable inference, suggests that [Gülen] is urging, directing, instigating that action be taken against members of the Doğan Movement, actions such as that which you allege was taken against [Plaintiffs]?" Plaintiffs' counsel responded, "[n]ot in plain English and specific language, no Your Honor." (Oral Arg., at 43-44).

the Court accepted a "dog-whistle" argument, Plaintiffs do not assert that Defendant Gülen's speech directed any specific action against members of the Doğan Movement, only that some action be taken, an insufficient allegation to overcome the minimum factual predicate necessary to displace the presumption against extraterritoriality. *See e.g. Balintulo*, 796 F.3d at 167[5]; *Baloco*, 767 F.3d at 1236-1237 (finding that, even if the murders "touch and concern the territory of the United States" because of the alleged involvement of Defendant, an American corporation, the allegations in the Complaint fell short of the "minimum factual predicate warranting the extraterritorial application of the ATS" and that "consideration of all facts weighs against a finding that Plaintiffs' claims touch and concern the territory of the United States with sufficient force to displace the presumption").

Plaintiffs also argue that Gülen's relevant conduct includes his "political strategy to have his followers secure official positions in the Turkish government" and his issuance of instructions via a narrator through two episodes of a Turkish television series which aired on a television station "indirectly controlled" by Gülen, the messages of which were "secretly" approved by Gülen before they aired. (Doc. 36, at 15-16) (citing Doc. 1, ¶¶ 5, 18, 19). With

---

[5] In *Balintulo*, the Second Circuit found that even assuming that the relevant conduct sufficiently touched and concerns the United States so as to displace the presumption against extraterritoriality which states a claim for a violation of the law of nations:

> a plaintiff stating a claim under an aiding and abetting theory must demonstrate that the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime; and (2) does so with the purpose of facilitating the commission of that crime. The *mens rea* standard for accessorial liability in ATS actions is purpose rather than knowledge alone. Knowledge of or complicity in the perpetration of a crime – without evidence that the defendant purposefully facilitated the commission of that crime – is thus insufficient to establish a claim of aiding and abetting liability under the ATS.

*Balintulo v. Ford Motor Co.*, 796 F.3d 160, 167 (2d Cir. 2015).

respect to the two episodes, issued soon after Gülen's speech, Plaintiffs allege that a

narrator in the first episode discussed a "dark council" consisting of international powers

dealing with the affairs of nations, including Turkey, and identified a group named *Tahşiye*,

affiliated with al-Qaeda, as the new terror organization to create a state of chaos in Turkey

and then in a second episode made similar predictions about a group the narrator identified

as "Rahle". (Doc. 1, ¶ 18).

Even accepting the aforementioned allegations as true, the pleadings that Gülen has

followers in Turkish government, gave a speech purportedly instructing his followers to

misuse the Turkish law enforcement system and approved two episodes of a television

series which Plaintiffs construe as instructions by Gülen himself for his followers to take

action, offer only circumstantial and tenuous allegations of a connection between Gülen's

domestic conduct and the violations of Plaintiffs' rights in Turkey.  Equally, they are not

sufficient to indicate any express understanding between Gülen and his followers that he

was issuing instructions to them to engage in acts which would amount to persecution of

members of the Doğan Movement or these members' arbitrary arrest and prolonged

detention.  This is particularly true in light of Plaintiffs' inability to point to any part of

Defendant Gülen's speech or the two television episodes which directly convey instructions

by Gülen.

Aside from Gülen's speech and approval of two Turkish television episodes, Plaintiffs

only put forth broad assertions to attempt to establish that Defendant Gülen gave

29

"instructions" to his followers to take actions against Plaintiffs or other members of the

Doğan Movement. The Complaint does not set forth, in a specific factual manner, the role

of Defendant Gülen, including his level of control over the Does' conduct and what specific

directions, instructions, or aid, if any, he provided the Does. For example, although

Plaintiffs allege that Gülen "targeted the members of the Doğan Movement for incarceration,

in order to discredit *Tahşiye's* critical voice, to consolidate his influence within the Nur

Movement, and to retaliate against his detractors" (Doc. 1, ¶ 15), in response to a question

by the Court inquiring what actions Gülen took to target theses members, Plaintiffs' counsel

responded that "he has a network of operatives and followers whom he sent instructions to,

through the words in the sermon and the television shows that he approved. . ." (Oral Arg.,

at 48-49). Accordingly, once again, the only concrete and specific allegations that Plaintiffs

can point to with respect to Gülen's actions in depriving Plaintiffs of their rights are Gülen's

speech and the subsequent two television programs that he allegedly secretly approved.

Assuming that Gülen's sermon and approval of the two *Tek Türkiye* episodes

constitute "relevant conduct" for purposes of this analysis, aside from the fact that

Defendant Gülen resides in Pennsylvania, there is no allegation that would allow this Court

to determine that this conduct "touches and concerns" the territory of the United States.

The Fourth Circuit's decision in *Al Shimari* offers the clearest example of when

conduct "touches and concerns" the U.S. with sufficient force to displace the presumption of

extraterritorially. There, substantial ties to the United States existed, including not only "tacit

approval" of the acts of torture by CACI managers in the United States, but a contract with the United States government and acts of torture committed at a U.S. military facility operated by U.S. government personnel. Here, there is no allegation in the Complaint that the U.S. government has legal, contractual, or political ties to Gülen or supports his purported efforts to use the Turkish law enforcement system to violate the rights of members of a particular religious group in Turkey or that any purported efforts by Gülen to target members of the Dogan Movement affected the United States or its interests in any way. Although ties to the U.S. government itself or conduct that directly affects or involves the United States or its personnel are not necessary to establish conduct that "touches and concerns" the territory of the United States, *Al Shimari* demonstrates the importance of this factor in determining whether U.S. interests are involved.[6]

While the U.S. government was not directly involved or affected in *Lively* and *Krishanti*, those cases involved conduct that "touched and concerned" the territory of the United States for other reasons, none of which apply here. Unlike in *Lively* where the defendants' conduct in the United States consisted of a number of specifically pleaded acts purposefully taken over many years, the result of which were causally related to events in Uganda, here Defendant Gülen's alleged conduct only consists of two specifically pleaded actions, i.e. a speech and approval of two television episodes, and the causation between

---

[6] *See also, e.g., Mwani v. Laden*, 947 F.Supp.2d 1 (D.D.C. 2013) (finding that a terrorist attack which was plotted in part in the United States and was directed at a United States Embassy in Kenya and its employees touched and concerned the United States with sufficient force to displace the presumption of extraterritoriality).

the speech, the narrator's comments, and the acts against Plaintiffs is speculative. This is particularly true in light of the lack of any direct or even discernable order in Gülen's speech for his "followers" to take any specific action(s). The present case is also distinguishable from *Krishanti* in large part because the LTTE's designated status as a terrorist organization by the United States and Defendants' continued support of the organization arguably demonstrate conduct that "touches and concerns" the United States and its interests. Further, as in *Lively*, Defendants' conduct in *Krishanti* was over an extended period of time, consisted of a number of acts, and was significantly more precisely alleged.

With respect to the allegation that Gülen encouraged "his followers to secure official positions within the official Turkish state apparatus – notably in police, prosecutorial and judicial positions – through whom he is able to exercise a corrupt influence in Turkish society" (Doc. 1, ¶ 5), this is an insufficient assertion to demonstrate conduct that "touches and concerns" the territory of the United States. Assuming for purposes of this motion that Gülen does have followers within the "Turkish state apparatus", this is arguably akin to a U.S. corporation who has employees in another country or who is working with individuals in another country. The situs of the person or corporation who is allegedly linked to the violations of international customary norms, without more specific and direct evidence of their participation in the violations, is insufficient to "touch and concern" the territory of the United States. *See generally, Balintulo v. Ford Motor Co.*, 796 F.3d 160 (2d Cir. 2015); *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229 (11th Cir. 2014).

In contrast to Plaintiffs' limited assertions of domestic conduct by Gülen, virtually all of the conduct which constitutes the foundation of Plaintiffs' claim for unlawful persecution, arbitrary arrest and prolonged detention, and aiding and abetting in the violation of these alleged international customary norms took place in Turkey. This includes the well-pleaded allegations of an intelligence note issued by Ali Fuat Yilmazer to the General Directorate of Police in Ankara identifying *Tahşiye* as a potentially dangerous organization, police chiefs applying to judges for judicial consent to wiretap telephones belonging to members of the Doğan Movement and for consent to surveil those members, and the resulting surveillance of the members (Doc. 1, ¶¶ 21-23). One of Plaintiffs' most specific allegations, the illegal entry by police officers of residential premises used by members of the Doğan Movement for religious gatherings and owned by the deceased brother of Plaintiff Yıldırım, wherein police officers planted inert explosive devices inside the premises in order to incriminate the members of the Doğan Movement (*id*. at ¶ 24) which led to the plaintiffs' incarceration in Turkey, occurred entirely in that country.

In short, Plaintiffs' Complaint makes clear that: (1) at all times, Plaintiffs were residing and operating in Turkey; (2) the "Does 1-50", including any judge and police officer alleged to have violated Plaintiffs' rights, all acted wholly in Turkey; (3) all surveillance of Plaintiffs, illegal or otherwise, took place in Turkey; (4) the evidence which led to Plaintiffs' incarceration was planted in Turkey; (5) the plaintiffs were incarcerated in Turkey, by Turkish authorities; (6) Defendant Gülen's speech, although recorded in the United States,

aired in Turkey and was directed at individuals in that country; (7) Defendant Gülen's speech did not contain any direct instruction to his followers to take action; (8) the two episodes purportedly approved by Gülen of *Tek Türkiye* aired in Turkey and were directed at individuals in that country.

Courts have made clear that the location where a plaintiff suffered his or her actual injury, by itself, is not determinative of whether a claim touches and concerns the United States, *see Al Shimari*, 758 F.3d at 528-529, *Drummond*, 592-593, 597-598, and that the impact of a defendant's conduct in the United States, felt in another country, does not necessarily deprive a plaintiff of a claim, *see Lively*, 960 F.Supp.2d at 321-322. Here however Plaintiffs' few allegations of conduct in the United States are largely pled in conclusory terms while the acts taken against Plaintiffs which took place in Turkey are pled with particularity. Taken together, these allegations do not demonstrate conduct that "touches and concerns" the territory of the United States, and in particular not with sufficient force to displace the presumption of extraterritoriality.

In determining whether relevant conduct which "touches and concerns" the territory of the United States does so with sufficient force to displace the presumption of extraterritoriality, courts should also consider the case's impact on foreign matters. The Supreme Court has repeatedly cautioned U.S. courts to take into consideration the extent to which the Court would be involving itself in foreign policy or passing judgment on foreign decision-making. *See e.g., Kiobel*, 133 S.Ct. at 1664, 1667, 1169; *Sosa*, 542 U.S. at 727.

Here, even assuming that Plaintiffs pled relevant conduct which "touches and concerns" the territory of the United States, the foreign policy consequences of this action weigh against this Court recognizing a cause of action pursuant to the ATS. As discussed in Section IV(B), *infra*, when assessing Plaintiffs' claims that they were subject to unlawful detention, arrest, and incarceration, Plaintiffs' Complaint in essence requests that the Court pass on, and possibly attempt to invalidate, the judicial administration of Turkish law and decisions, political or otherwise, made by Turkish government officials.[7]

For all of the aforementioned reasons, the Court will dismiss Plaintiffs' claims brought pursuant to the ATS (Counts I-IV) for lack of subject matter jurisdiction.[8]

## B. The Act of State Doctrine

The act of state doctrine is predicated on the concept that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own

---

[7] A court must also consider the difficulty of bringing a foreign national into a U.S. Court to answer for his or her alleged actions. *See Al Shimari*, 758 F.3d at 530; *Lively*, 960 F.Supp.2d at 322-324. Although such a difficulty would not arise with respect to Defendant Gülen who currently resides in Pennsylvania, it appears that all of the other defendants, Does 1-50, who are alleged to be co-conspirators who were in some form or manner directly or indirectly involved in carrying out the conspiracy and other acts alleged in the Complaint (*see* Doc. 1, ¶ 10), live in Turkey.

[8] Because the Court will dismiss Plaintiffs' Complaint on the aforementioned grounds, we do not address whether the Complaint satisfies the ATS's other jurisdictional predicates. In particular, the Court notes that there may be a question as to whether Plaintiffs' Complaint adequately pleads a violation of the law of nations. However, Defendant acknowledges that he did not move on that theory. (Oral Arg., at 27, 28). Therefore, the Court expresses no opinion whether Plaintiffs' allegations create a cause of action for violations of international law norms that are "specific, universal, and obligatory." *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 11

L.Ed.2d 804 (1964) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 42

L.Ed. 456 (1897)).  The doctrine "expresses the strong sense of the Judicial Branch that its

engagement in the task of passing on the validity of foreign acts of state may hinder rather

than further this country's pursuit of goals both for itself and for the community of nations as

a whole in the international sphere." *Id.* at 423.  Thus, the act of state doctrine "requires

evaluation whenever adjudication of a controversy might hinder the executive department in

the conduct of foreign relations." *Williams v. Curtiss-Wright Corp.*, 694 F.2d 300, 301 (3d

Cir. 1982).  The scope of this doctrine also includes the impact on the ministerial acts of a

foreign government. *Id.*

The Supreme Court has repeatedly only found the act of state doctrine to be

applicable when the relief sought or the defense interposed would require a U.S. court to

declare an official act of a foreign sovereign, performed within that sovereign's territory, to be

invalid. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405-406,

110 S.Ct. 701, 107 L.Ed.2d 816 (1990)(collecting cases).  Therefore, "[a]ct of state issues

only arise when a court *must decide* – that is, when the outcome of the case turns upon – the

effect of official action by a foreign sovereign." *Id.* at 406 (emphasis in original).  When

determining whether the act of state doctrine is applicable, the acts of foreign sovereigns

taken within their own jurisdiction must be deemed to have been valid. *Id.* at 409.

Here, despite Plaintiffs' assertions to the contrary, the issues in this action would

require a U.S. Court to determine whether the alleged acts taken against Plaintiffs were valid,

not simply whether they occurred[9]. Plaintiffs' Complaint alleges the following:

> [On or about December 2014], the Turkish government discovered the
> conspiracy [against members of the Doğan Movement], launched an
> investigation and removed the conspirators from their official positions.
> Plaintiffs have since been released from incarceration, and replacement
> prosecutors have recommended dismissal of all criminal charges against them.
> In September 2015, an indictment was issued against the co-conspirators in
> Turkey, and the case was accepted by the Turkish courts in October 2015.

(Doc. 1, ¶ 28). As a result of the Turkish government's current actions, Plaintiffs argue that

this Court or a fact-finder at trial will not be required to overrule the finding(s) of a Turkish

Court. (Oral Arg., at 61). Rather, Plaintiffs frame the issue as "the actions of individuals

that were taken outside of the law, perhaps, sometimes, cloaked in the clothing of law

enforcement but taken outside the law, as part of a conspiracy that was engaged in by a

number of individuals that was set into motion by Mr. Gülen" and assert that "none of those

actions and none of the rulings that this Court would have to make will have to either

invalidate or approve of or take any other position on any action of the Turkish

Government." (Id. at 64).

Plaintiffs' argument is flawed. Although the "conspirators" have been removed from

their positions and an indictment has been issued against them, there is no indication that

the case has been resolved in the Turkish court system. Nor is there any allegation that the

---

[9] The Court takes as true, for purposes of ruling on Defendant's Motion to Dismiss, that the actions
taken by Turkish officials alleged by Plaintiffs in their Complaint actually occurred, i.e. that Plaintiffs were
illegally surveilled and imprisoned.

"conspirators" were not acting in judicial, prosecutorial, or law enforcement capacities when taking the actions of which Plaintiffs complain. Thus, this Court risks parallel proceedings with Courts in Turkey in determining whether the "conspirators" violated Plaintiffs' rights or acted outside the scope of their positions, raising an issue of international comity. Plaintiffs are asking this Court to determine whether the "conspirators'" actions were in fact "taken outside of the law" or were, as Defendant argues, "perform[ed] within the four corners of their Government function" (see id.), a determination clearly better left to Turkish officials and its judiciary. Plaintiffs' request would not only require this Court or a fact-finder to evaluate whether the Turkish government and judiciary's actions at the time that Plaintiffs allege their rights were violated were lawful but also whether the current actions of the Turkish government in indicting the co-conspirators and removing them from their positions were lawful, or instead, politically motivated. In effect, Plaintiffs are requesting that this Court judge the validity, and not simply determine the occurrence, of the alleged unlawful actions taken by Turkish officials against Turkish citizens in Turkey, a request the Supreme Court has cautioned would be barred pursuant to the act of state doctrine. See W.S. Kirkpatrick & Co., 493 U.S. at 405-406. Such an invitation by Plaintiffs to sit in judgment of the decisions of Turkey's political, law enforcement, and judicial officials also invokes exactly the type of foreign-policy determinations that the Supreme Court has warned federal courts to avoid. See e.g. Kiobel, 133 S.Ct. at 1664, 1667, 1169; Sosa, 542 U.S. at 727.

38

## C. Plaintiffs' State Law Claims

As a result of this Court's holding that it lacks subject matter jurisdiction over Plaintiffs' ATS claims, the only remaining counts against Defendants arise out of state law claims for False Imprisonment (Count V) and Civil Conspiracy (Count VI). However, these claims provide no basis to invoke U.S. courts and U.S. law in matters that this Court has already found do not touch and concern the United States in any meaningful manner. For the Court to accept ancillary jurisdiction over the state law claims, having determined that it does not have jurisdiction over Plaintiffs' federal claims which form the heart of Plaintiffs' action, would lead to anomalous results, not reconcilable with the Court's determination that it lacks subject matter jurisdiction over Plaintiffs' ATS claims.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss the Complaint (Doc. 33). Because any amendment to the Complaint would be futile, Plaintiffs will not be given leave to amend.[10] A separate Order follows.

Robert D. Mariani
United States District Judge

---

[10] The dismissal of this action, without leave to amend, obviously does not foreclose Plaintiffs, or other Turkish citizens, from attempting to bring a new action under the ATS based on additional and more specific allegations of conduct by Gülen, and that conduct's direct connection to injuries suffered by individuals in Turkey. However, as long as the operative allegations remain the same, i.e. that members of Turkey's judiciary and law enforcement carried out the actions about which Plaintiffs complain, the requirement that the acts complained of "touch and concern" the territory of the United States presents an insurmountable burden which, in this Court's view, may not be overcome even by amplified allegations with respect to Gülen's speech and the two television episodes broadcast in Turkey for the Turkish people.